**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. 19-cr-372 (EGS)** |
| **MICHAEL BROOKS, JR.,** | : | |
| **also known as "Tank,"** | : | **MAGISTRATE NO. 19-MJ-276** |
| **JEWEL LAFONTANT,** | : | |
| **also known as "Jewel Brooks,"** | : | |
| **LINDA BROOKS,** | : | |
| **also known as "Auntie,"** | : | |
| **also known as "Aunt,"** | : | |
| **AARON WALKER,** | : | |
| ██████████████████████ | | |
| ██████████████ | : | |
| | : | |
| **EARL MAURICE TERRELL,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S MEMORANDUM FOR PRETRIAL DETENTION**
**OF DEFENDANTS MICHAEL BROOKS, JR. AND AARON WALKER**

      The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion for pretrial detention of Defendants Michael BROOKS, Jr. and AARON WALKER. [1] In support of this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

**BACKGROUND AND STATEMENT OF FACTS**

      In approximately October 2017, the Drug Enforcement Administration (DEA) began an investigation into a drug-trafficking conspiracy involving Michael BROOKS Jr. The DEA

---

[1] Two indicted defendants have not yet been apprehended and, consequently, the instant case remains sealed. The names of the at-large defendants have been redacted from this memorandum.

utilized confidential sources of information, controlled purchases of narcotics, surveillance, wiretaps, search warrants and other law enforcement processes during its investigation.

### 1.   Controlled Purchases and Title III Wire Investigation

Using a confidential source, the DEA made approximately nine controlled purchases of cocaine from BROOKS Jr. for a net weight of over 900 grams of cocaine. These purchases occurred from February 2018 to May 2019, and are the subject of Counts 2 through 10 of the Indictment in the instant case.

Based on the controlled purchases and other evidence, the DEA conducted a Title III wire investigation. The wire investigation began in May 2019 and concluded in November 2019. The interception of communications of BROOKS Jr., WALKER and their coconspirators produced a clear picture of a structured drug distribution network that operated primarily in and around Washington, D.C., Maryland and Virginia. Three of the targeted telephones belonged to BROOKS Jr. As evidenced by numerous controlled purchases and wire interceptions, BROOKS Jr. sold multiple ounce quantities of cocaine and cocaine base (also known as crack cocaine) together with co-defendants Jewel LAFONTANT and Linda BROOKS, and with others. During the interceptions of BROOKS Jr.'s Target Telephones #1, 2 and 3 (also referred to as TT-1, TT-2 and TT-3, respectively), it became evident that he along with LAFONTANT and Linda BROOKS sold wholesale amounts of cocaine and crack cocaine to redistributors of cocaine and crack cocaine. One of those redistributors was defendant Aaron WALKER.

The interceptions from BROOKS Jr.'s Target Telephones and co-defendant Earl TERRELL's Target Telephones (TT-4 and TT-5) also evidenced that Defendant TERRELL was a monthly supplier of ½-kilogram quantities of cocaine to BROOKS Jr.

1. **Sample of Interceptions Establishing Michael BROOKS Jr. was a Coconspirator of Supplier Earl TERRELL**

_Suspected Money Exchange between Brooks Jr. and Terrell on August 19, 2019_

On August 16, 2019, at approximately 9:25 p.m., in activation 769 on TT-3, BROOKS Jr. called TERRELL who was utilizing TT-4. Prior to this conversation, there were approximately six other incoming calls to TT-3 from TT-4, starting on August 14, 2019, that went unanswered. During the call on August 16, 2019, BROOKS Jr. said, "Yo Earl…Earl…Earl… Earl… Hello?" to which TERRELL answered, "yeah," BROOKS Jr. said, "Yeah, I'm scraping man, the price is too high." TERRELL stated, "Tank man, you…you is blowing me off dawg." Due to the sound quality, parts of the conversation were inaudible, but BROOKS Jr. can be heard again saying that he is "scraping." BROOKS Jr. repeated, "Man, I'm scraping man. I mean, I mean niggas ain't rocking with this number man. You know what I mean. So I'm out here scraping the best way I can man." It should be noted that it appears, from the number of unanswered incoming calls to BROOKS Jr. leading up to activation 769, that BROOKS Jr. was avoiding TERRELL. During this same period, BROOKS Jr. was answering calls from people other than TERRELL and making calls to people other than TERRELL. It is believed that when BROOKS Jr. tells TERRELL that he's "scraping," he was communicating to TERRELL that he was trying to get money together, but was having difficulty selling his narcotics in a timely manner because his purchase price from TERRELL was too high, and in turn, his sale price to his customers, was too high. Thus, he was explaining why he had not answered TERRELL's phone calls.

TERRELL responded by saying, "So what you want? What is going to make you better though dawg? You want to give it to them for free?" BROOKS Jr. replied, "Nah… hell nah. Man

that why I be down there dragging ass because of that. Honestly, I ain't even gonna lie to you man. They tired, they getting better deals somewhere else." TERRELL followed, "So you saying the numbers too high for you dawg?" During this point in the conversation, it is believed that BROOKS Jr. was again informing TERRELL that the price of the narcotics was too high and customers were finding better prices elsewhere.

BROOKS Jr. then stated, "Man, I'm just saying, I'm just telling you what peoples telling me out here. I don't know. I mean, I'm not complaining." TERRELL agreed and said, "Yeah, they telling me that same shit," and "he gave me something man, I ain't even like though man. That motherfucker, he won't, won't hit me." Based on the conversation, it is believed that TERRELL is talking about the price and quality of narcotics and when he states, "That motherfucker… won't hit me," law enforcement believes that TERRELL is saying that his own source of supply will not text or call him back.

The conversation then turned to the subject of a family get together being planned by TERRELL's brother, Gregory Terrell. At the end of the conversation, TERRELL told BROOKS Jr. that he would not be around during the weekend and was coming back on Monday. BROOKS Jr. said, "Alright, well I'm still cool though. Well by the time you get back man, I may actually have it for you, honestly," and "You know when I be like Imma have it, I be have it when I said I'm gonna have it. Even if it's probably a day later, I'll still be having it. Cause I already see what I got." Law enforcement believes that in this statement by BROOKS Jr., he is either referring to money that is owed to TERRELL or having enough money to purchase more narcotics from TERRELL. Case agents know through their training and experience that oftentimes a supplier will "front" narcotics, or sell on consignment, to re-distributors with the

understanding and agreement that the money will be paid at a later date, usually when the narcotics are sold by the re-distributor.

On August 19, 2019, law enforcement was utilizing electronic surveillance equipment to monitor TERRELL's home in Hyattsville, Maryland. At approximately 2:54 p.m., law enforcement observed, in real-time, a silver vehicle arrive at the residence and a tall, black male individual, with physical characteristics similar to TERRELL, exit the driver's side door. An unknown black female was observed exiting the front passenger side. At approximately 2:56 p.m., law enforcement observed both subjects enter the front door of TERRELL's home. At approximately 3:10 p.m., law enforcement observed the male subject exit the residence and walk towards the trunk of the vehicle. Law enforcement observed the male reach inside the trunk briefly, before walking to the driver's side door. Between approximately 3:09 p.m. and 3:10 p.m., BROOKS Jr. attempted to place two outgoing calls to TT-4, activations 1206 and 1208, both of which were unanswered. At approximately 3:11 p.m., law enforcement observed the black male subject enter the driver's side door and leave the drive away from TERRELL's home. Around the same time, BROOKS Jr. received an incoming call from TT-5. Case agents reviewing the intercepted call recognized the voice of the subject talking to BROOKS Jr. as being consistent with TERRELL's voice. This was based on previous interceptions between BROOKS Jr. and TERRELL. In activation 1211 on TT-5, TERRELL asked BROOKS Jr., "Are you around there?" and BROOKS Jr. said, "Yeah, yeah I'm over at his house now." TERRELL replied, "I'm gonna come to that motherfucker, right now, cause I, I'm just getting my bags out." Although no "bags" were physically seen during surveillance, it is believed by law enforcement through training and experience, as well as knowledge of this investigation, that narcotics

traffickers commonly use coded language when referring to narcotics or amounts of U.S. currency, in an attempt to deter law enforcement and to conceal their criminal activity. BROOKS Jr. concurred, saying, "alright, see you in like ten minutes, fifteen minutes," and TERRELL answered, "no… now, (unintelligible) corner right now." During this telephone call, law enforcement observed BROOKS Jr. in the area of a home on Galloway Road NE. This location is a known stash location for BROOKS Jr. It is also known to be the residence of his mother, Darlene BROOKS. At approximately 3:17 p.m. in activation 1213, BROOKS Jr. received another incoming call from TT-5. During this call TERRELL told BROOKS Jr., "I am right here." Law enforcement observed TERRELL's vehicle arrive in the area of Galloway Street NE. Law enforcement also observed BROOKS Jr. appear and walk towards TERRELL's vehicle, eventually entering the front passenger side door at approximately 3:18 p.m. At approximately 3:25 p.m., BROOKS Jr. was observed exiting the vehicle, before getting into his own vehicle and leaving the area. Agents noted that as BROOKS Jr. was walking to TERRELL's vehicle, he was cautiously looking around in all directions, appearing to be vigilant of his surroundings before going inside. Based upon numerous observations and surveillance operations of BROOKS Jr., law enforcement is aware that BROOKS Jr. is surveillance conscious, taking notice of unfamiliar vehicles or subjects in the area indicating the presence of law enforcement. Surveillance teams were not in a position to see what exactly occurred inside of TERRELL's vehicle. However, it is noted that the behavior and manner of the meeting between BROOKS Jr. and TERRELL on August 19, 2019, was consistent with previous interactions between BROOKS Jr. and other co-conspirators, such as being vigilant of his surroundings and meeting inside of a vehicle for a

brief period. BROOKS Jr.'s overall behavior, including his failure to meet inside of his stash house, is indicative of criminal activity, in particular drug trafficking.

BROOKS Jr.'s Narcotics Resupply from TERRELL on September 3, 2019

Communications between BROOKS Jr. and TERRELL continued on August 30, 2019. At approximately 9:59 p.m., BROOKS Jr. received an incoming call from TT-4 on TT-3 in activation 2922. During this call TERRELL asked BROOKS Jr., "Where you at Tank," to which BROOKS Jr. responded, "Uh, riding up…ahh… Thirteenth Street. You alright?" TERRELL replied, "Oh yeah. I'm in the house. So, ahh ahh, what the fuck you looking like?" BROOKS Jr. answered, "By my estimate, I think it's like thirteen and that's not talking about what's going on now." Based upon law enforcement's knowledge of the investigation, and previous intercepted calls, it is believed that TERRELL was asking how BROOKS Jr. was faring in terms of money and selling narcotics. It is further believed that BROOKS Jr. was informing TERRELL that he may have about $13,000 in drug proceeds, not including the sales he had lined up for the night of August 30, 2019. Case agents reviewed the intercepted data for TT-2 for the night of August 30, 2019, and found that he had several narcotics sales lined up with customers around the time of activation 2922. TERRELL responded, "Oh shit. So that motherfucker got slow but that mother fucker cranked up like a son of a bitch." It is believed that TERRELL was making a reference to activation 769, in paragraph 36 as described above, in which BROOKS Jr. originally told him that he was struggling to sell the narcotics because of the high sale price. Near the end of the conversation, TERRELL said**,** "shit so I guess you talking next week then?" BROOKS Jr. replied, "I know it's gonna be before Wednesday though. Probably Tuesday… Monday or

Tuesday," and, "Like Monday or Tue… probably, all depend on how the way I keep going. It keep up like this it be Monday." TERRELL ended, "Right, alright, well give me buzz."

On September 2, 2019, at approximately 2:51 p.m., BROOKS Jr. received an incoming call from TT-4 on TT-3 in activation 3148. During this call BROOKS Jr. told TERRELL that, "everything good." BROOKS Jr. further stated, "Alright, well, it would be, I, I'll probably come down today or if not, it would just be in the morning.... but if you need me to come tonight, I will." TERRELL told BROOKS Jr., "You alright, you alright, go ahead." The conversation concluded with BROOKS Jr. saying, "Alright bet. Well, I'll just see you tomorrow and I'll call you after I drop the kids over at school." TERRELL concurred with "alright." Law enforcement believes that BROOKS Jr. was telling TERRELL that he was ready to purchase more narcotics, however, he was pushing the meeting off until the following day.

Following the call with TERRELL, BROOKS Jr. continued to update his customers on TT-2 about the status of his narcotics supply. For example, on September 2, 2019 at approximately 5:26 p.m. on TT-2 in activation 3015, BROOKS Jr. received an incoming call from a telephone number suspected of being utilized by a drug customer. Several previously intercepted communications between BROOKS Jr. and this drug customer are consistent with him being a customer of BROOKS Jr.'s. During this conversation, BROOKS Jr. told the unidentified customer, "I'm sitting out here waiting for him. I'm gonna wait for him 'til like six thirty, if he ain't back by then, I'm out." BROOKS Jr. then said, "it's probably gonna be in the morning… it's gonna either be today or I know was tell him it be in the morning." Based on other intercepted communications, it is believed that BROOKS Jr. was referring to waiting for TERRELL.

8

On September 3, 2019, in activation 3220 on TT-3, BROOKS Jr. made an outgoing call to TT-4 at approximately 7:26 a.m. The call was not answered. Based on GPS real time data location from TT-2, law enforcement inferred that the purpose of this call was for BROOKS Jr. to advise TERRELL that he was on his way to see him from his residence in Baltimore, Maryland. It should be noted that following this attempted contact; DEA experienced a total loss of power to the building in which the listening post is set up. Due to this malfunction, no calls were intercepted until power was restored later that afternoon. Even though calls were not intercepted, BROOKS Jr.'s incoming and outgoing text messages were intercepted and were retrieved once the power was restored. Toll data for TT-4 and TT-5 was obtained to gather lost call data. Prior to the power outage, law enforcement had already established surveillance at TERRELL's home. Toll data for TT-5 shows an outgoing call to BROOKS Jr. at approximately 7:32 a.m. According to toll data, this conversation lasted approximately forty (40) seconds. Following that call, at approximately 7:33 a.m., TT-5 sent an outgoing text message to BROOKS Jr. saying, "Call on this phone." At approximately 8:00 a.m., toll data for TT-5 shows an incoming call from BROOKS Jr. that lasted approximately 13 seconds. Following that call, TT-5 received an incoming text message from BROOKS Jr. that read "ok."

At approximately 8:11 a.m., law enforcement observed a tall, black male subject, later identified as TERRELL, exit TERRELL's Hyattsville home and enter his vehicle. The vehicle was surveilled via helicopter with unbroken surveillance from TERRELL's home to the area of Galloway Street NE where he ultimately met with BROOKS JR. Law enforcement officers near Galloway Street NE observed BROOKS Jr.'s vehicle in the vicinity prior to TERRELL's arrival. At approximately 8:18 a.m., toll data for TT-5 shows an outgoing call to BROOKS Jr. At

approximately 8:19 a.m., law enforcement surveillance observed TERRELL arrive in the area of Galloway Street NE. At approximately 8:20 a.m., law enforcement observed BROOKS Jr. walking towards the TERRELL's vehicle. BROOKS Jr. was observed constantly looking around, being vigilant of his surroundings, as he acted in previous meets. Aerial surveillance captured BROOKS Jr. enter TERRELL's vehicle, via the front passenger door. At approximately 8:24 a.m., BROOKS Jr. exited TERRELL's vehicle, returned to his, and both vehicles left the area. TERRELL was then followed to a Bank of America branch located at 915 Rhode Island Avenue NE, Washington, D.C. with unbroken aerial surveillance.

After meeting with TERRELL, BROOKS Jr. made several outgoing calls to previously identified customers explaining that he is "good" and explaining, "you are going to like this new stuff here." Agents know through training and experience that drug traffickers, to include BROOKS Jr., often state that they are "good" when they are in possession of narcotics and have it available for resale. Additionally, by saying "you are going to like this new stuff here," BROOKS Jr. was advising his customers that the newly acquired narcotics were of a high quality.

<u>BROOKS Jr.'s Narcotics Resupply from TERRELL on November 1, 2019</u>

Because of wire interceptions between TERRELL and BROOKS Jr., law enforcement suspected that TERRELL was going to provide BROOKS Jr. with a resupply of cocaine on November 1, 2019. Law enforcement surveilled TERRELL's home and observed him leaving his home and traveling towards the District of Columbia where he was expected to meet with and resupply BROOKS Jr. TERRELL observed law enforcement and fled at a high rate of speed in an apparent attempt to elude police, which was successful. Several calls were intercepted

between TERRELL and other subjects following the described events. In activation 6758, an outgoing call from TT-5, TERRELL told a male subject that he was not going to "let these motherfuckers jack me again." In an intercepted conversation with BROOKS Jr. (activation 6847 on TT-5), TERRELL described being followed to BROOKS Jr. and told BROOKS Jr., "Fuck them. When they come, they come. Like I said, a mother fucker ain't hard to get. You know what I mean. Ain't no mother fucking, ain't no need to acting like, you know what I mean, it is what it is." He then told BROOKS Jr., "We'll meet up, we will see, you know, on the low."

## 2. Admissions by BROOKS Jr. and Search Warrant on Stash Location

BROOKS Jr. was arrested on November 8, 2019, pursuant to an arrest warrant issued by this Court. He was advised of, and waived, his Miranda rights. During his interview, BROOKS Jr. admitted that he was a cocaine and crack cocaine supplier. He admitted that for the last approximately 2 years he has been acquiring a ¼ kilogram to a ½ kilogram of cocaine once or twice a month from TERRELL that he then redistributed to others. He admitted that on November 1, 2019, he was resupplied ¼ kilogram of cocaine by TERRELL. He also admitted that he stored narcotics at an apartment on Bladensburg Road, NE, Washington, DC, and that approximately 170 to 190 grams of cocaine and 20 to 28 grams of crack cocaine was presently being stored at the apartment. At the time of BROOKS Jr.'s admissions on November 8, 2019, a search warrant was being executed at the Bladensburg apartment, which revealed quantities of cocaine and crack cocaine consistent with the narcotics described by BROOKS Jr. and located at the precise location described by BROOKS Jr. Law enforcement also recovered substantial drug trafficking paraphernalia at the Bladensburg Road apartment including a large quantity of baking soda, a necessary ingredient for the manufacturing of crack cocaine.

**3.  Sample of Interceptions Establishing Aaron WALKER Was a Coconspirator of BROOKS Jr. and Seizure of Cocaine From WALKER**

Investigators determined during the interception period of BROOKS Jr.'s Target Telephones that BROOKS Jr. was a source of supply of cocaine and crack cocaine to Aaron WALKER. The wiretaps, surveillance and a traffic stop of WALKER established that WALKER is a redistributor for BROOKS Jr. who acquires approximately 31 grams (approximately 1 ounce) of cocaine per week. An ounce of cocaine has a wholesale value of approximately $1,200, which is likely to generate approximately $4,000 in street profit. Since at least June 2018, WALKER has communicated with BROOKS Jr. an average of approximately 100 times per month. All, or virtually all, of their intercepted communications have been about narcotics. In light of the length of the relationship, frequency and quantities of the buys, WALKER is responsible for over 500 grams of cocaine and cocaine base.

On May 8, 2019, BROOKS Jr., using TT-1, was involved in a series of activations (activation# 790, 801, 802, 803) with WALKER on a telephone subscribed to WALKER. BROOKS Jr. sent an outgoing text message to WALKER, activation #790, at approximately 7:51 pm on May 8, 2019. The text read, "u gd [good]," to which WALKER replied, "sat [Saturday]." In activation #802, BROOKS Jr. texts WALKER, "bet. its two blocks left." On May 10, 2019, during activation #1170, BROOKS Jr. received an incoming phone call from WALKER. During that conversation, WALKER told BROOKS Jr. "make one of them thirty four straight and put some whatever in the other twenty eight." BROOKS Jr. confirmed WALKER's request by repeating, "okay, thirty four and twenty eight." WALKER then stated, "Yeah, because thirty four is for me straight and the other junk so I have something to do with it." We believe he was ordering 62 grams of cocaine, 28 grams of which was going to be altered.

12

On May 21, 2019, there were further conversations (activation #2218, 2224, 2226, 2304, 2311, 2319, 2323, 2324, 2325, 2327, 2333, 2335, 2338, and 2340) between BROOKS Jr. and WALKER. At approximately 8:03am, in activations #2218 and 2224, BROOKS Jr. texted WALKER, "waitin on u," to which WALKER replied, "hit u when get off." In activation #2325, at approximately 7:04pm, WALKER texts "1x straifht up," to which BROOKS Jr. texted back, "got u." It is believed that "1x straight up" was coded language for one ounce, or a "31" (31 grams) of cocaine.

As a result of these communications, law enforcement surveilled WALKER as he travelled from his residence in Frederick, Maryland, to the meeting between BROOKS Jr. and WALKER in D.C. Upon the completion of the meeting, law enforcement continued to follow WALKER back into Maryland, where a traffic stop was effected by uniformed police in Montgomery County, Maryland. Law enforcement recovered approximately 30.09 grams of cocaine from WALKER's person and he was subsequently arrested on state charges of possession with intent to distribute narcotics. Law enforcement maintained unbroken surveillance of WALKER from the time he left his residence to the time of the traffic stop. During the arrest, officers positively identified WALKER through his Maryland driver's license and they recovered the phone he used to communicate with BROOKS Jr. WALKER's possession of cocaine with the intent to distribute on May 21, 2019, resulted in Count 12 of the Indictment.

On May 23, 2019, BROOKS Jr. received an incoming call, activation 2478, from WALKER, who was using a different telephone number. During this call WALKER advised that this number was his "girl's" number. WALKER told BROOKS Jr. that he "got hit last night,"

and that he got "pulled over for some shit on my car." BROOKS Jr. then asked, "But you was good on the other part right . . . you ain't had nothing with you did you?" WALKER then responded, "That's what I had with me." BROOKS Jr. followed with, "what you talking about, what you got from me that day?" WALKER then said, "Yeah." BROOKS Jr. then answered with, "oh shit." WALKER then told BROOKS Jr. to "change" his phone number because law enforcement had seized his phone following his arrest.

Despite his arrest and the pendency of his criminal case in Montgomery County, WALKER continued to conspire with BROOKS Jr. and acquire cocaine from him for redistribution purposes. For example, the two men met on June 18, 2019, so that WALKER could receive "just one joint." (Act. #303 on TT-1.) Law enforcement believes that WALKER acquired an ounce of cocaine, approximately 31 grams of cocaine. In activations #1971, 1972 and 1974, on August 26, 2019, WALKER communicated with BROOKS Jr. and texted him, "on way al solid." BROOKS confirmed, "that's how it is, one piece." It is believed that WALKER was ordering from BROOKS Jr. cocaine, in particular crack cocaine.

4. **Basis for Pretrial Detention**

A. **MICHAEL BROOKS, Jr.**

As part of the Cocaine and Crack Cocaine conspiracy, BROOKS Jr. is alleged to have conspired to distribute and possess with the intent to distribute five kilogram or more of cocaine and cocaine base. At the time of the commission of this offense, BROOKS Jr. was on supervised release for a 2015 federal cocaine trafficking conviction in 14-cr-000126 in Washington, D.C. Prior to that case, BROOKS Jr. was convicted in 2013 of drug trafficking in Baltimore, Maryland and discharging a firearm. BROOKS Jr. was on probation in this case at time he

committed the 2015 federal case. In 2003, BROOKS Jr. was convicted of cocaine trafficking in two cases in Washington, D.C., case numbers 2002-FEL-003833 and 2002-FEL-001775. Finally, he was convicted in 1997 of Marijuana possession in Washington, D.C. in case number 1997-cmd-001953. BROOKS Jr. is a recidivist and a habitual cocaine trafficker.

In this case, the evidence against BROOKS Jr. is strong. It consists of intercepted phone calls that detail his cocaine and crack cocaine trafficking. The evidence also includes controlled purchases of cocaine from BROOKS Jr. where almost 1 kilogram of cocaine was purchased. The evidence also includes surveillance evidencing drug transactions with TERRELL, WALKER and other coconspirators and seizures of large quantities of cocaine and crack cocaine. BROOKS Jr. has also admitted to his drug trafficking and his admissions evidence an extensive conspiracy involving large amounts cocaine and crack cocaine.

It is also clear that despite his prior convictions, his past incarcerations and his stints under court supervisions, nothing has stopped him from trafficking in extremely dangerous drugs that are destroying our communities.

## B.    AARON WALKDER

As part of the conspiracy, Aaron WALKER is alleged to have conspired to distribute and possess with the intent to distribute 500 grams or more of cocaine and cocaine base. He was also indicted on one count of possession with the intent to distribute cocaine.

As discussed above, the wiretap evidence establishes that WALKER was a cocaine trafficker who acquired ounce quantities of cocaine from BROOKS Jr. on a weekly and consistent basis. His involvement in this business was confirmed with the seizure of over 30 grams of cocaine during his arrest in Montgomery County after he met with BROOKS Jr. It is

also important to note that despite his arrest and the fact that his criminal case was pending in Montgomery County, WALKER continued in the conspiracy and was unrelenting in acquiring cocaine from BROOKS Jr. It is even more remarkable that WALKER has been determined by the Pretrial Services Agency to be a recidivist who has numerous prior narcotics convictions and violent crimes, and is a serious risk of flight. It is also important to note that after he was arrested in Montgomery County during the instant investigation, WALKER informed BROOKS Jr. of his arrest, that the police seized his both his phone and the cocaine BROOKS Jr. distributed to him, and he then told BROOKS Jr. to get rid of his phone, a clear attempt to obstruct and impede law enforcement's investigation.

In this case, the evidence against WALKER consists of intercepted phone calls and the seizure of cocaine. The interceptions, some of which are discussed above, establish that WALKER acquired his supply of cocaine and crack cocaine from BROOKS Jr. They further establish that he acquired one or two ounce quantities of narcotics on a weekly basis and despite his arrest and pending criminal case in Montgomery County, he continued to conspire with BROOKS Jr. to traffic in cocaine and crack cocaine.

## **APPLICABLE LAW**

Here, the Government has requested a pretrial detention hearing under a provision of the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(C), which provides that a judicial officer "shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community" upon motion for a case that involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled

Substances Act." 18 U.S.C. § 3142(f)(1)(C). The Controlled Substance offense charged here meets these criteria.

Under the statute, pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight. *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). In considering either justification, the charged offense here (given that it is a Controlled Substances offense punishable by a maximum term of imprisonment of more than ten years and therefore meets the criterial of 18 U.S.C. § 3142(f)(1)(C)) carries with it a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense. 18 U.S.C. § 3142(e)(3) and (e)(3)(A). By itself, an indictment establishes that probable cause and triggers the presumption. *See*, *e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("the indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). Furthermore, under the Bail Reform Act the Government may proceed by way of proffer. *Smith*, 79 F.3d at 1210.

When considering the interplay of the statutory presumption and the "safety of any other person and the community" and "flight risk" justifications for pretrial detention, the common sense reasons for both the Bail Reform Act and the statutory presumption's treatment of serious drug trafficking offenses should be kept in mind. Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v.*

*Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Strong*, 775 F.2d at 507. As noted by the D.C. Circuit:

The legislative history indicates that the rebuttable presumption covering serious drug trafficking offenses was included because:

'Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences.'

*United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203). Thus, in creating a presumption of pretrial detention for serious drug trafficking offense, both the legislative history and the statutory language make clear that very "real-world" concerns lie behind the recognition of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking offenses.

To be sure, that presumption is rebuttable and does not shift the ultimate burden of proof from the Government's shoulders. But it does create a burden of *production* on the defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court amongst others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight." *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir.

1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); *United States v. Rueben*, 974 F.2d. 580, 586 (5th Cir. 1992) (the mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . . *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach)" (internal citation omitted)); *see also United States v. Ali*, 793 F. Supp. 2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

In making a pretrial detention decision, by statute a judicial officer must consider four factors: 1) the nature and circumstances of the offense charged, including whether the offense involves such things as a controlled substance or a firearm; 2) the weight of the evidence against the person; 3) the history and characteristics of the person; and 4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Here, the first factor, the nature and circumstances of the offenses charged, clearly weighs in favor of detention. Here, a grand jury found probable cause to believe that Defendants BROOKS Jr. and WALKER were involved in a conspiracy to distribute and possess with the intent to distribute cocaine and crack cocaine, with BROOKS Jr. being indicted for 5 kilogram or more of cocaine and WALKER being indicted for 500 grams or more of cocaine. BROOKS Jr. was also indicted on 10 counts of distribution of cocaine, 1 count of possession with the intent to distribute cocaine, and 1 count of possession with the intent to distribute crack cocaine. WALKER was also indicted on 1 count of possession with the intent to distribute cocaine. The distribution of these extremely menacing narcotics pose a very significant danger to our community. The nature of these offenses and the statutory presumption therefore weigh heavily in favor of detention. Furthermore, the seriousness of the offense also poses a significant risk of substantial incarceration for the Defendants. If convicted, BROOKS Jr. will be subject to a mandatory minimum 10 years' incarceration and up to a maximum of life. WALKER faces a mandatory minimum sentence of 5 years incarceration and up to 40 years. These potential sentences do not take into account the enhanced penalties due to any prior drug trafficking and violent crime convictions. Additionally, the counts for distribution and possession with intent to distribute could result in a period of incarceration of up to 20 years each. That exposure, in turn, only increases the incentive of the Defendants to flee.

The second factor, the weight of the evidence, also clearly weighs in favor of detention. As set forth above, this case involves an extensive investigation that included intercepted communications, surveillance, controlled buys, and seizures, all of which establish that the Defendants have engaged in a conspiracy to traffic in large quantities of cocaine and crack

cocaine.

The third factor, the history and characteristics of the person, also weigh in favor of detention. In total, the Defendants are subject to mandatory periods of incarceration on the drug charges. These offenses, in concert with prior felony convictions, warrant detention in this case. This is further amplified by the fact that BROOKS Jr. was on supervision when he committed the offenses in this case and he has a long history of violating his supervision by continuing to traffic in narcotics. Similarly, WALKER has violated supervision in the past and has been convicted of fleeing and eluding from police.

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the Defendants' release, also weighs in favor of detention. As discussed above, the Defendants' activities pose a substantial danger to the community. The members of this conspiracy are involved in the large-scale distribution of PCP. In creating the statutory presumption for pretrial detention, as noted above, Congress recognized the high risk of pretrial recidivism of those involved in serious drug trafficking offenses. Here, the continuing danger to the community that is posed by these defendants is quite evident.

In the end, given all of these facts and circumstances, the Defendants simply cannot present evidence sufficient to overcome the statutory presumption that the Defendants should be held without bond. Furthermore, even apart from that presumption, the weight of the evidence and the gravity of the alleged offenses provide compelling justification for the continued detention of the Defendants until this case is resolved.

WHEREFORE, the Government requests that the Court order the above-referenced Defendants to be detained without bond pending resolution of this case.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:  _____/s/_____
GEORGE ELIOPOULOS
Assistant United States Attorney
DC Bar No. 390601
555 4th Street, N.W., Room 4205
Washington, D.C. 20001
(202) 252-6957
George.p.eliopoulos@usdoj.gov